**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>*v.*<br><br>**MARCUS HEDGEPETH** | **CRIMINAL ACTION**<br><br>**NO. 22-377-KSM** |

**MEMORANDUM**

**MARSTON, J.** **October 31, 2023**

Defendant Marcus Hedgepeth was indicted by a grand jury on a single count of violating 18 U.S.C. § 922(g)(1), which forbids any person "who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year" from "possess[ing] … any firearm or ammunition." (Doc. No. 1.) Before the Court is Hedgepeth's motion to dismiss the indictment in which he argues that the Third Circuit's recent *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) renders § 922(g)(1) unconstitutional both on its face and as applied to him. (Doc. No. 25.) Hedgepeth's arguments are without merit, and the Court denies the motion.

## I. Factual Background

Marcus Hedgepeth is certainly no stranger to the criminal justice system. Within the past three years alone, Hedgepeth has pled guilty to two first-degree felonies, both of which are punishable by 10 to 20 years imprisonment, and a second-degree misdemeanor, punishable by one to two years imprisonment. (Doc. No. 27 at 4.) As detailed more below, both sets of crimes involved violent or dangerous acts on the part of the Defendant.

First, on April 21, 2021, Hedgepeth pled guilty to "Possession of Firearm Prohibited" in violation of 18 Pa. Cons. Stat. § 6105(a)(1), and "Recklessly Engendering Another Person" in

violation of 18 Pa. Cons. Stat. § 2705. (*Id.*) According to the Government, Hedgepeth was observed on video discharging a firearm in the direction of another individual during an altercation. (*Id.*) A subsequent search showed that Hedgepeth had a firearm laser sight on his person and a semi-automatic weapon with live rounds loaded under the mattress of his six-year-old son's bed. (*Id.*)

Then, on September 27, 2022, Hedgepeth pled guilty to "Burglary – Overnight Accommodation, Person Present" in violation of 18 Pa. Cons. Stat. § 3502(a)(1). (*Id.*) Defendant illegally entered the home of an 84-year-old woman to steal her jewelry and vehicle. (*Id.*)

That brings us to the indictment at issue. On May 14, 2022, while on probation, Hedgepeth allegedly was involved in a shootout with an individual he identified as his brother.[1] (*Id.* at 1–2; Doc. No. 25 at 3.) Later that day, Hedgepeth was pulled over for traffic violations. (Doc. No. 27 at 2.) Through a search of his vehicle during that traffic stop, officers discovered a black Smith & Wesson .45 caliber handgun containing a live round and eight .45 caliber spent shell casings. (Doc. No. 27 at 2–3; Doc. No. 25 at 3.) A search of the discovered firearm's serial number revealed that it had been reported stolen roughly two years prior. (Doc. No. 27 at 3–4.)

On October 27, 2022, Defendant was indicted by a grand jury on one count of violating 18 U.S.C. § 922(g)(1). (Doc. No. 1.) The indictment stated that despite having been convicted in a court of "the Commonwealth of Pennsylvania of a crime punishable by imprisonment for a term exceeding one year," Hedgepeth possessed a "Smith & Wesson, model M&P 45, .45 caliber auto semi-automatic pistol . . . leaded with one live round of .45 caliber ammunition." (*Id.*)

## II. Applicable Law: The *Bruen* and *Range* Decisions

[1] Hedgepeth's motion suggests that he simultaneously faces state charges in Philadelphia County for his conduct in the shootout. (Doc. No. 25 at 3.)

Hedgepeth moves to dismiss his indictment, arguing that § 922(g)(1) violates his Second Amendment right. The Second Amendment provides, in relevant part, that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This right, however, is "not unlimited." *D.C. v. Heller*, 554 U.S. 570, 626 (2008). Indeed, as the Supreme Court outlined in *Heller*, "[f]rom Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* Instead, on multiple occasions, the Supreme Court has outlined that the Second Amendment allows for a "variety" of firearm regulations, including the "longstanding prohibitions on the possession of firearms by felons." *Id.* at 626, 636; *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' . . . We repeat those assurances here.") (citation omitted).

The Supreme Court revisited the Second Amendment this past year in *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022). In *Bruen*, the Supreme Court held unconstitutional a New York statute requiring individuals to show that "proper cause" existed before they would be provided a license to carry a firearm outside of their home. *Id.* at 2123, 2156. In so deciding, the Court clarified the standard by which courts are to analyze whether a firearm regulation is consistent with the Second Amendment. Prior to *Bruen*, the Courts of Appeals "coalesced" around a "two-step" test that combined history with means-end scrutiny. *Id.* at 2125. Under this test, a firearms regulation was constitutional so long as the government showed either 1) that the conduct regulated was beyond the scope of the Second Amendment right as originally understood or 2) passed either intermediate or strict scrutiny, with the

appropriate standard determined by whether the regulation burdened a "core" Second Amendment right. *Id.* at 2126–27. The Supreme Court held that this approach was "one step too many." *Id.* at 2127. Rejecting the means-end approach, the Court held that for a firearm regulation to be constitutional, the "government must affirmatively prove" that it is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* In other words, courts must "assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

The Court acknowledged that while in some situations, such an analysis "will be fairly straightforward," such as where "a challenged regulation addresses a general societal problem that has persisted since the 18th century," *id.*, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach," *id.* at 2132. In such situations, courts are instructed to "reason[] by analogy" and find that a "historical regulation is a proper analogue for a distinctly modern firearm regulation" only where "the two regulations are 'relevantly similar.'" *Id.* To determine whether regulations are "relevantly similar under the Second Amendment" the Court pointed to two metrics: the "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2133. The Court clarified that "analogical reasoning requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*. So even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* (emphasis in original).

Given that the challenge in *Bruen* did not implicate § 922(g)(1), the majority opinion had no occasion to address the constitutionality of the statute. Nevertheless, six Justices (Roberts, Alito, Kavanaugh, Breyer, Sotomayor, and Kagan), through concurring and dissenting opinions

signaled their understanding that the majority opinion in *Bruen* did not call into question the constitutionality of the § 922(g)(1). *See id.* at 2157 (Alito, J., concurring) (noting that the decision does not "disturb[ ] anything that [the Court] said in *Heller* . . . about restrictions that may be imposed on the carrying of guns"); *see also id.* at 2162 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (emphasizing that "the Second Amendment allows a 'variety' of gun regulations," and that *Bruen* did not "cast doubt on longstanding prohibitions on the possession of firearms by felons" (citation omitted)); *id.* at 2189 (Breyer, J., dissenting, joined by Sotomayor, and Kagan, JJ.) (explaining that "[l]ike Justice KAVANAUGH, I understand the Court's opinion today to cast no doubt on th[e] aspect of *Heller*'s holding" that addressed presumptively lawful firearm restrictions, including the prohibition of the possession of a firearm by a felon).

Shortly after *Bruen*, the Third Circuit issued its *en banc* opinion in *Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023), which Hedgepeth now seeks to invoke. *Range* was a civil action brought by Bryan Range who sought a declaration that 18 U.S.C. § 922(g)(1) violated the Second Amendment only as applied to him, and an injunction prohibiting the law's enforcement against him. *Id.* at 98–99. Twenty-eight years prior, Range had pled guilty to one count of making a false statement to obtain food stamps, in violation of 62 Pa. Cons. Stat. § 481(a). *Id.* at 98. In short, Range misrepresented how much money he earned when filling out a food stamp application at a time where he was supporting his wife and three children on $300 per week of income. *Id.* This conviction, although classified as a misdemeanor, was punishable by up to five years' imprisonment and thus Range was precluded from possessing a firearm under § 922(g)(1). *Id.* Range, however, desired a rifle and potentially a shotgun for hunting and self-defense. *Id.* at 99.

The district court granted summary judgment to the Government, "faithfully applying" the then-controlling two-step analysis. *Id.* Range appealed and while his appeal was pending, the Supreme Court's opinion in *Bruen* was issued. *Id.* The Third Circuit panel permitted briefing on *Bruen*'s impact, but nevertheless affirmed the dismissal of Range's complaint, finding that the government had "met its burden to show that § 922(g)(1) reflects the Nation's historical tradition of firearm regulation such that Range's conviction 'places him outside the class of people traditionally entitled to Second Amendment rights.'" *Id.* (quoting *Range v. Att'y Gen.*, 53 F.4th 262, 266 (3d Cir. 2022)). The Third Circuit granted Range's petition for rehearing *en banc*. *Range v. Att'y Gen.*, 56 F.4th 992 (3d Cir. 2023).

The Third Circuit's *en banc* opinion reversed the panel, holding that § 922(g)(1) was unconstitutional as applied to Range. The court interpreted *Bruen*'s historical framework as requiring two steps:

> After *Bruen*, we must first decide whether the text of the Second Amendment applies to a person and his proposed conduct. If it does, the government now bears the burden of proof: it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."

*Range*, 69 F.4th at 101 (quoting *Bruen*, 142 S. Ct. at 2127) (citations omitted). The court answered the first question in the affirmative, rejecting the Government's argument that the Second Amendment only covered "law-abiding, responsible citizens" and instead holding that Range, like all Americans, was one of "the people" guaranteed Second Amendment rights. *Id.* at 101–03. The Court found the question of whether the Second Amendment covered Range's conduct to be an "easy question," holding that his request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Id.* at 103.

Turning to the second step of the *Bruen* analysis, the Court held that the Government had failed to meet its burden of demonstrating that the restriction set forth in § 922(g)(1), as applied to Range, was "consistent with the Nation's historical tradition of firearm regulation." *Id.* The Court found the Government's reliance on language in *Heller* describing § 922(g)(1)'s prohibition as "longstanding" was insufficient, and that the Government's invoked historical analogues were inapt. *Id.* at 103–06.

Since the government failed to carry its burden under the newly established *Bruen* framework, the Court reversed the panel's prior decision. *Id.* at 106. But the Court stressed that its holding was "a narrow one." *Id.* The majority emphasized that the government had failed to show that "our Republic has a longstanding history and tradition of depriving *people like Range* of their firearms" and thus § 922(g)(1) was unconstitutional *as applied* to Range. *Id.* (emphasis added). Indeed, as made clear by Judge Ambro's concurrence, the majority's opinion did not "spell doom for § 922(g)(1)" or limit Congress' ability to disarm those "who pose a threat to the orderly functioning of society." *Id.* at 109, 113 (Ambro, J., concurring); *see also United States v. Blackshear*, No. CR 23-159, 2023 WL 5985284, at *2 (E.D. Pa. Sept. 14, 2023) (noting that "*Range*'s holding was narrow and limited to the facts of that case, particularly the nature of Bryan Range's previous conviction"). Instead, § 922(g)(1) remains "presumptively lawful." *Range*, 69 F.4th at 109–10 (Ambro, J., concurring) (quoting *Bruen*, 142 S. Ct. at 2162).

## III. Hedgepeth's Arguments Are Without Merit

Hedgepeth argues that, applying *Range*, his indictment should be dismissed on four separate grounds: 1) § 922(g)(1) violates the Second Amendment as applied to him; 2) § 922(g)(1) violates the Second Amendment on its face; 3) § 922(g)(1) is unconstitutionally vague; and 4) § 922(g)(1) is an unconstitutional extension of Congress's Commerce Clause

powers. Because the Court finds that none of these arguments have merit, it will deny Hedgepeth's motion to dismiss his indictment.

**A. Section 922(g)(1) is Constitutional as Applied to Hedgepeth, A Violent Felon.**

Hedgepeth argues that § 922(g)(1) is unconstitutional as applied to him because his possession of a firearm "falls squarely within the heartland of the Second Amendment" and after *Range*, the Government is unable to meet its burden of showing that the application of § 922(g)(1) to Hedgepeth is consistent with the Nation's historical tradition of firearm regulation. (Doc. No. 25 at 5–7.) Applying the two-step *Bruen* analysis, the Court must first "decide whether the text of the Second Amendment applies to a person and his proposed conduct." *Range*, 69 F.4th at 101. If so, the Government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.*

At the first step, the Government correctly concedes that under *Range*, Hedgepeth is among "the people" covered by the Second Amendment, despite his prior felony convictions. (Doc. No. 27 at 8); *see Range*, 69 F.4th at 101–03 (outlining that all citizens fall within the purview of the Second Amendment, not just those who are "law-abiding"). However, the Government argues that Hedgepeth's *conduct* is not covered by the Second Amendment. (Doc. No. 27 at 9–12.) In *Range*, the Third Circuit gave this portion of the analysis short shrift, deeming it an "easy question" and finding that Range's request "to possess a rifle to hunt and a shotgun to defend himself at home" tracked the constitutional right. *Range*, 69 F.4th at 103. Here, the Government argues that three facts complicate the analysis: 1) Unlike in *Range*, Hedgepeth has not shown that he possessed a firearm for a lawful purpose; 2) Hedgepeth was on probation at the time that he was found possessing a firearm and thus had already forfeited his

Second Amendment right; and 3) the firearm that Hedgepeth possessed was reported as stolen. These arguments have some force. *See United States v. Terry*, No. 2:20-CR-43, 2023 WL 6049551, at *4 (W.D. Pa. Sept. 14, 2023) (finding that defendants failed the first step of the *Bruen* test because they were on probation and thus their conduct was not governed by the Second Amendment); *United States v. Jenkins*, No. CR 23-088, 2023 WL 6534200, at *6 (E.D. Pa. Oct. 6, 2023) ("[W]here a Section 922(g)(1) defendant cannot prove by a preponderance of the evidence that he was carrying a firearm for the purpose of self-defense—or other conduct expressly covered by the Second Amendment, such as hunting—the right to bear arms does not protect the defendant, and the indictment survives an as-applied challenge."). *But see United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311, at *9 (M.D. Pa. Sept. 1, 2023), appeal docketed, No. 23-2604 (3d Cir. Sep. 6, 2023) (rejecting argument that the Second Amendment didn't cover defendant where he possessed gun while on probation/parole). But because the Court finds below that the Government has met its burden at the second step, it need not address these issues and will assume that the Second Amendment covers Hedgepeth's conduct without so deciding.[2]

Turning to the second step of the *Bruen* analysis, the Court must determine whether the Government has shown that § 922(g)(1) as applied to Hedgepeth "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. As previously discussed, the Supreme Court in *Bruen* provided that this historical tradition can be established by analogical reasoning, which "requires only that the government

[2] The Government also argues that *Range* was wrongly decided. (Doc. No. 27 at 5.) Because the Court is bound by Third Circuit precedent and the Government makes clear that it includes this argument solely for preservation purposes, the Court will not address it. *See In re Asbestos Prods. Liab. Litig. (No. VI)*, 384 F. Supp. 3d 532, 544 (E.D. Pa. 2019) ("The district court is the lowest court in our federal hierarchical system and is bound by rulings of its circuit court and the Supreme Court.").

identify a well-established and representative historical analogue, not a historical twin." *Id.* at 2133. In identifying a historical analogue, the Court in *Bruen* warned that "not all history is created equal." *Id.* at 2136. Because the Second Amendment codified a "pre-existing right," "English history dating from the late 1600s, along with American colonial views leading up to the founding" are relevant to identifying the scope of the right. *Range*, 69 F.4th at 106 (Krause, J., dissenting) (quoting *Bruen*, 142 S. Ct. at 2127).

As an initial matter, the Court rejects Hedgepeth's argument that *Range* dictates the dismissal of his indictment because the Third Circuit rejected "all the historical evidence that has been relied on by the government in other post-*Bruen* litigation to date." (Doc. No. 25 at 6.) While it is true that in *Range* the Third Circuit held that the government failed to establish "a longstanding history and tradition of depriving people *like Range* of their firearms," Hedgepeth is demonstrably not "like Range." *Range*, 69 F.4th at 106 (emphasis added). The most significant distinguishing fact is that Hedgepeth's prior felonies place him in a group of individuals who have "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *Kanter v. Barr*, 919 F.3d 437, 454 (7th Cir. 2019) (Barrett, J., dissenting). Hedgepeth was first convicted two years ago of possession of a firearm and reckless endangerment after he shot at another individual and was found to have a loaded firearm under his six-year-old son's bed. (Doc. No. 27 at 4.) Hedgepeth was convicted again just 17 months later for burglary after he broke into an elderly woman's home to steal her jewelry and vehicle. (*Id.*) These convictions are a far cry from Range's singular, 28-year-old conviction for making a false statement on a food stamps application to help his struggling family. The Government's failure to carry its burden with respect to non-violent individuals like Range suggests little about its ability to do so here where a dangerous felon is at issue. *See United States v. O'Connor*, No.

CR 03-134, 2023 WL 5542087, at *3 (W.D. Pa. Aug. 29, 2023) (suggesting that in *Range*, the Third Circuit held that the government had failed to meet its burden "in light of [Range's] non-violent conviction"). Indeed, along with suggesting that their holding was "narrow," the court in *Range* specifically stated they were not deciding the issue of whether § 922(g)(1) is constitutional as applied to dangerous felons. *Range*, 69 F.4th at 104 n.9.

Rather than relying solely on the Third Circuit's analysis in *Range* as Hedgepeth suggests, the Court must independently determine whether the Government has presented a sufficient historical basis for disarming dangerous felons like Hedgepeth. The Court finds the Government has met this burden.

Turning first to the pre-Founding era, a timeframe the Supreme Court has found enlightening regarding the scope of the Second Amendment, the Government has put forth evidence that individuals who posed a potential danger to others were frequently disarmed. *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety."). Such restrictions date back to England, from whom we "inherited" our right to bear arms. *Heller*, 554 U.S. at 599. For example, a 17th Century English statute allowed the government to "seize all arms in the custody or possession of any person" who was "judge[d] dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13.

Numerous colonies and states followed their English predecessors in disarming those who they deemed dangerous either because of their violent acts or their disloyalty. *See Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others. Violence was one

ground for fearing danger, as were disloyalty and rebellion.”). *United States v. Jackson*, 69 F.4th 495, 502–04 (8th Cir. 2023) (collecting instances in which colonial American legislatures permitted the disarmament of individuals); *cf. Range*, 69 F.4th at 120–128 (Krause, J., dissenting) (providing a thorough examination of legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution that disarmed former felons). For example, a colonial New Hampshire statute permitted “affrayers, rioters, disturbers or breakers of the peace” to have their “arms or weapons” taken away. Act for the Punishing Criminal Offenders, 1696-1701 N.H. Laws 15; *see also* Act for the Punishment of Criminal Offenders, 1692-93, ch. 18, § 6 *reprinted in* 1 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 52-53 (1869) (providing the same). Similarly, in March of 1776, the Continental Congress recommended that states disarm individuals who were “notoriously disaffected to the cause of America” or who “refuse[d] to associate, to defend, by arms the United American Colonies, against the hostile attempts of the British fleets and armies.” 4 Journals of the Continental Congress 1774–1789, at 205 (1906). Massachusetts acted on this advice, shortly thereafter passing a law permitting the disarmament of individuals who refused to declare loyalty to the United States. Act of May 1, 1776, ch. 21, § 1, *reprinted in* 5 The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay 479 (1886). Numerous other states, such as Pennsylvania, North Carolina, and Virginia, followed suit and passed laws providing for the confiscation of weapons owned by persons refusing to swear an oath of allegiance to the state or the United States. *See* Act of June 13, 1777, ch. 756, § 2–4, *reprinted in* 9 The Statutes at Large of Pennsylvania from 1652–1801 at 110–113 (William Stanley Ray ed., 1903); *United States v. Reichenbach*, No. 4:22-CR-00057, 2023 WL 5916467, at *7 (M.D. Pa. Sept. 11, 2023) (citing 24 The State Records of North Carolina 89 (Walter Clark ed. 1905); 9

William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 282 (1821)). And an early New Jersey statute allowed the government to disarm any individual that it judged "disaffected and dangerous to the present Government." Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90.

As the Government argues, precursors to the Second Amendment further support the assertion that the founding generation permitted the disarmament of dangerous individuals. During the Pennsylvania ratifying convention, a "highly influential" minority proposal, *Heller*, 554 U.S. at 604, stated that "no law shall be passed for disarming the people or any of them unless for crimes committed, or *real danger of public injury from individuals*." 2 Bernard Schwartz, The Bill of Rights: A Documentary History 665 (1971) (quoting The Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents, 1787) (emphasis added). Similarly, a proposal at the Massachusetts constitutional ratifying convention provided that Congress may not "prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." *Id.* at 681 (emphasis added).

This disarmament of individuals who were deemed dangerous continued post-ratification and through the Reconstruction era.[3] For example, a federal Reconstruction order applicable to South Carolina provided that "no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms." Cong. Globe, 39th Cong., 1st Sess. 908–909 (1866). Further, as discussed in Judge Ambro's concurrence in *Range*, numerous states disarmed "tramps" whereas

[3] While the Court in *Bruen* emphasized that earlier historical evidence is particularly enlightening on the scope of the Second Amendment, they also made clear that evidence from the Reconstruction era was relevant at the very least as "confirmation of what the Court thought had already been established" through older laws. *Bruen*, 142 S. Ct. at 2137; *cf. Range*, 69 F.4th at 112 (Ambro, J., concurring) ("[T]he Supreme Court has not yet decided whether individual rights are defined by their public understanding at the time of the ratification of the Bill of Rights in 1791 or the Fourteenth Amendment in 1868.").

other states prohibited individuals who were "not engaged in any legitimate business" or had "ever borne arms against the government of the United States" from possessing a firearm. *Range*, 69 F.4th at 112 (quoting 2 General Statutes of the State of Kansas 353 (1897)).

Utilizing the "why" and "how" metrics set forth by the Supreme Court in *Bruen*, it is clear that these statutes present apt analogues to § 922(g)(1)'s restrictions on Hedgepeth's Second Amendment rights.[4] Turning first to the "why" metric, while these various historical statutes have somewhat different language, targets, and impact, the common thread is that they were all efforts to disarm groups that "lawmakers deemed dangerous and disruptive to society" in an attempt to protect "the public from violence and disorder." *Reichenbach*, 2023 WL 5916467, at *7. Here too, disarming individuals like Hedgepeth who have shown a proclivity toward violence and an inability to safely hold firearms serves the purpose of protecting the public from unnecessary danger and disruption. Similarly, the "how" metric suggests that these statutes are closely aligned: both these historical statutes and § 922(g)(1) reflect a decision from lawmakers that disarming dangerous individuals was an appropriate means to ensure public safety. Accordingly, § 922(g)(1), as applied to Hedgepeth, is sufficiently analogous to the historical practices of firearm regulation and the Government has met its burden under *Range* and *Bruen*.

In sum, Hedgepeth asks this Court to read *Range* to permit even those individuals who have demonstrated a proclivity toward violence an unwavering right to bear arms. This the

[4] Defendant argues that because § 922(g)(1) does not "address a problem that was unimaginable at the founding" the Government is required to show a "distinctively similar" historical analogue as opposed to a "relevantly similar" analogue. (Doc. No. 25 at 6.) Defendant is correct that "[r]egulations targeting longstanding problems must be 'distinctly similar' to a historical analogue," *Range*, 69 F.4th at 103, whereas a regulation that was unimaginable at the time of the founding need only be "relevantly similar." *Bruen*, 142 S. Ct. at 2132–33. However, neither test requires a "historical twin." *Jenkins*, 2023 WL 6534200, at *3. Because the Court finds that the Government has met its burden regardless of which standard is applied, it need not address which test is appropriate.

Court cannot do. Instead, given the scads of historical examples of lawmakers disarming those who they believed posed a potential danger to society, "this Court heeds—as it must—the wisdom of our Nation's founding generation, which demonstrated through early American legislation that the right to bear arms must by necessity yield to the need to safeguard the Country's citizens." *Reichenbach*, 2023 WL 5916467, at *10.

**B. Section 922(g)(1) is Constitutional on its Face.**

Hedgepeth secondarily argues that § 922(g)(1) is facially unconstitutional because there is "no founding-era history of disarming people convicted of felonies at all." (Doc. No. 25 at 7–8.) To succeed on a facial challenge, Hedgepeth "must establish that no set of circumstances exists under which the [§ 922(g)(1)] would be valid." *United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011). Under this exacting standard, Hedgepeth's argument fails for a panoply of reasons.

First, contrary to Hedgepeth's assertion and as set forth above, there is historical evidence from the founding-era and beyond that supports the disarming of dangerous individuals. *See supra* at 11-14. And since Hedgepeth cannot show that § 922(g)(1) is unconstitutional even as applied to him, he has failed to demonstrate that there are no circumstances in which the statute will be constitutional. This forecloses any facial challenge. *See Blackshear*, 2023 WL 5985284, at *3 (rejecting facial challenge to § 922(g)(1) where Defendant failed to show that the statute "is unconstitutional as applied to his case, let alone in all circumstances.").

Second, the Supreme Court has signaled that § 922(g)(1) remains constitutional after *Bruen*. In *Heller* and *McDonald*, the Supreme Court held that the "longstanding prohibitions on the possession of firearms by felons" is "presumptively lawful." *Heller*, 554 U.S. at 626–27 & n.26; *McDonald*, 561 U.S. at 786. This language was not dicta, *United States v. Barton*, 633

F.3d 168, 171 (3d Cir. 2011), and nothing in the Court's most recent opinion in *Bruen* suggests that this holding from *Heller* and *McDonald* is no longer good law, *see United States v. Morales*, No. 3:22-CR-161, 2023 WL 6276672, at *3 (M.D. Pa. Sept. 26, 2023) ("*Bruen* did not invalidate, alter, or overturn the legal principles and analysis set forth in *Heller* and *McDonald*, but instead, relying extensively on those two cases, clarified the appropriate test that must be applied in addressing Second Amendment challenges to firearms regulations."). To the contrary, as indicated earlier, six of the Justices, through concurring and dissenting opinions, signaled their view that § 922(g)(1) is constitutional even after *Bruen*. *See supra* at 5. Thus, this Court, bound by the Supreme Court's statement in *Heller* and *McDonald*, finds that § 922(g)(1) is a facially constitutional restriction on an individual's Second Amendment right.

The Third Circuit's opinion in *Range* does not, and could not for that matter, mandate a different result. Instead, the Court takes the Third Circuit at its word that the opinion was "narrow" and only held § 922(g)(1) unconstitutional as applied to those "like Range." *Range*, 69 F.4th at 106. The Court agrees with Judge Ambro that *Range* did not "spell doom" for § 922(g)(1) more generally and that the statute remains "presumptively lawful." *Id.* at 109 (Ambro, J., concurring); *see also id.* at 110 (outlining that *Range* "speaks only to [Range's] situation, and not to those of murderers, thieves, sex offenders, domestic abusers, and the like"); *Terry*, 2023 WL 6049551, at *5 ("Nothing in *Range* suggests that the Third Circuit meant to declare § 922(g)(1) unconstitutional in all circumstances. Quite the opposite."); *O'Connor*, 2023 WL 5542087, at *2 ("The decision in *Range* did not undermine the constitutionality of § 922(g)(1) in all situations.").

Finally, the Court notes that nearly every opinion in this circuit addressing this issue after *Range* has held that § 922(g)(1) is constitutional both on its face and as applied.[5] While these opinions are not binding, this trend undermines any attempt by Hedgepeth to show that § 922(g)(1) is unconstitutional in every application.[6]

---

[5] *See, e.g.*, *Blackshear*, 2023 WL 5985284 (Pappert, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with multiple felony drug and firearm convictions based on *Heller* and the history of disarming dangerous individuals); *United States v. Ames*, No. 23-178, 2023 WL 5538073 (E.D. Pa. Aug. 28, 2023) (Kenney, J.) (denying as-applied and facial challenges to section 922(g)(1) by defendant with felony robbery and firearm convictions based on *Heller*'s "presumptively lawful" holding and longstanding felon dispossession statutes); *United States v. Minter*, No. 22-155, 2023 WL 6051265 (M.D. Pa. Sept. 15, 2023) (Mariani, J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on *Heller* and historical statutes disarming individuals "deemed dangerous, untrustworthy, or unlikely to abide by the law"); *Reichenbach*, 2023 WL 5916467 (Brann, C.J.) (denying as-applied and facial challenges to § 922(g)(1) by defendant with felony drug convictions based on historical prohibitions which were sufficiently analogous to § 922(g)(1) prohibiting drug traffickers from possessing firearms); *United States v. Wise*, No. CR 21-511, 2023 WL 6260038 (W.D. Pa. Sept. 26, 2023) (Hardy, J.) (denying as-applied and facial challenges to § 922(g)(1) based on historical analogues which "disarmed individuals who were deemed to be dangerous, untrustworthy, or a threat to the orderly functioning of society"); *United States v. Cotton*, No. CR 22-471, 2023 WL 6465836 (E.D. Pa. Oct. 4, 2023) (Pratter, J.) (denying as-applied challenge to § 922(g)(1) based on historical analogues disarming individuals who "posed a potential danger"); *United States v. Ladson*, No. CR 23-161-1, 2023 WL 6810095 (E.D. Pa. Oct. 16, 2023) (Baylson, J.) (denying as-applied challenge to § 922(g)(1) based on government identifying "numerous historical analogues establishing that the Second Amendment permits the disarmament of those who, like Defendant, are 'dangerous to the Peace.'"); *United States v. Green*, No. CR 22-387, 2023 WL 6164407 (E.D. Pa. Sept. 21, 2023) (Diamond, J.) (rejecting facial and as-applied challenges to § 922(g)(1) based on *Heller* and historical analogues).

[6] In an untimely letter submitted nearly two months after the Government filed its opposition, Defendant argues that the Court should follow the Honorable Jennifer P. Wilson's two recent opinions in *United States v. Quailes*, No. 1:21-CR-0176, 2023 WL 5401733 (M.D. Pa. Aug. 22, 2023) and *United States v. Harper*, No. 1:21-CR-0236, 2023 WL 5672311 (M.D. Pa. Sept. 1, 2023) which dismissed the indictments of two individuals, one with prior multiple felony drug offenses and another with 13 prior felony offenses including multiple armed robberies and drug trafficking convictions. (Doc. No. 34.) The Court does not agree. Judge Wilson's opinions (which largely mirror each other) are based on the conclusion that the Government had failed to meet its burden of demonstrating that prohibiting drug traffickers from possessing firearms is consistent with the Nation's historical tradition of firearm regulation. Here, by contrast, the historical record presented by the Government demonstrates that the Government has carried its burden. Accordingly, the Court, as others have before it, does not find these opinions persuasive. *See Reichenbach*, 2023 WL 5916467, at *10 n.93 (M.D. Pa. Sept. 11, 2023); *United States v. Pearson*, No. CR 22-271, 2023 WL 6216527, at *3 (E.D. Pa. Sept. 25, 2023) ("We are mindful of two recent decisions (now on appeal) finding section 922(g)(1) unconstitutional as applied to persons with earlier convictions for possessing narcotics with intent to distribute. We are not persuaded by the reasoning in those decisions given the presumptively lawful regulatory measures enacted by Congress in section 922(g)(1).").

Since Hedgepeth has failed to show that § 922(g)(1) is unconstitutional in all circumstances, or even in his own case for that matter, the Court finds § 922(g)(1) constitutional on its face.[7]

**C. Section 922(g)(1) is Not Unconstitutionally Vague.**

Hedgepeth further argues that § 922(g)(1) is unconstitutionally vague. He asserts that "[a]fter *Range*, Section 922(g)(1) can no longer criminalize much of the conduct it purports to outlaw" and thus fails to "give ordinary people fair warning about what the law demands of them." (Doc. No. 25 at 8–9 (quoting *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).)

The Court finds this argument unpersuasive. A law is unconstitutionally vague only where it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted). Section 922(g)(1) does not run afoul of this principle because it "provides explicit notice that it bars the possession of a firearm by any person who has previously been convicted of a crime punishable by more than a year in prison (or of certain misdemeanors as specifically defined)." *Blackshear*, 2023 WL 5985284, at *3. That the Third Circuit held that § 922(g)(1) was unconstitutional when applied to the particular facts presented in *Range* does little to undermine the clear directive set forth in the statute. *See United States v. Williams*, 553 U.S. 285, 305 (2008) (noting that "the mere fact that close cases can be envisioned" does not render a statute vague). Further, any confusion regarding the scope of the statute following *Range* is undermined by the near unanimous

[7] The Government also argues that § 922(g)(1) is constitutional on its face because in the founding generation, many felonies were punishable by death, exposing individuals to "far more severe consequences than disarmament." (Doc. No. 27 at 20.) However, the Third Circuit explicitly rejected this argument in *Range*, finding the Government's invocation of historical statutes that subjected individuals to more severe punishments "does not suggest that the particular (and distinct) punishment at issue—lifetime disarmament—is rooted in our Nation's history and tradition." *Range*, 69 F.4th at 105.

treatment of the issue in this circuit following the Third Circuit's *en banc* opinion. The Court thus finds that § 922(g)(1) is not unconstitutionally vague.

### D. Section 922(g)(1) is Not an Unconstitutional Extension of Congress's Commerce Clause Powers.

Grasping for straws, Hedgepeth finally asserts that § 922(g)(1) is inconsistent with the original public meaning of the Commerce Clause. (Doc. No. 25 at 9–10.) But, as Hedgepeth acknowledges, binding precedent "continue[s] to foreclose this Court from second-guessing . . . Congress's power to regulate commerce." (*Id.* at 9 (citing *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937)); *see also United States v. Singletary*, 268 F.3d 196, 204–05 (3d Cir. 2001) (holding that § 922(g)(1) does not lie beyond Congress's Commerce Clause powers); *United States v. Gateward*, 84 F.3d 670, 671–72 (3d Cir. 1996) (same). Consistent with this clear line of precedent, the Court must find that § 922(g)(1) is an appropriate application of Congress's Commerce Clause powers.

* * *

Since the Court finds that none of Hedgepeth's arguments have merit, it denies his motion to dismiss his indictment. An appropriate order will follow.